FRANK F. BARLOW *et al.* v. ELIZABETH A. BARLOW.

RESULTING TRUSTS — *Homestead Purchased with Wife's Funds.* Where a husband and wife reside in another state, and she has a considerable amount of property and he has none, and he is nearly blind, and they agree to come to Kansas and procure land which shall belong to her, and they come and settle upon a quarter-section of government land, intending to procure the title under the United States homestead laws, and the entry thereof is made in his name, but she furnishes all the money to pay the costs and expenses thereof, and to make all the improvements thereon, and valuable improvements are made thereon, and, when final proof is made it is made in his name, but still it is the intention and agreement of the parties that the property shall be hers, and he agrees to convey the title to her as soon as the patent shall be issued, she agreeing to furnish him a home thereon as long as he shall live, and they continue to reside upon the property, and she continues to make improvements thereon, and in a little more than one month after the final proof is made the husband dies intestate, and without executing to his wife any deed for the land, *held,* that under the facts of the case the wife is entitled to the property.

*Error from Mitchell District Court.*

THIS was an action brought in the district court of Mitchell county on September 1, 1885, by *Frank F. Barlow*, Ernest C. Barlow, Eldora A. Thompson, Fidelia C. Everett, Flo Ellen Viers, Huldah A. Frazier and Mattie A. Allen against Elizabeth A. Barlow and Harry P. Stimson, for the partition

of the northwest quarter of section 16, in township 7 south, of range 7 west. The defendant *Elizabeth A. Barlow* answered, denying generally all the allegations of the plaintiffs' petition except such as she expressly admitted, and then by way of new matter alleged many facts, and asked that she be decreed to be the absolute owner of the property in controversy; that the defendants be decreed to specifically perform a certain contract set forth in her answer; that they be barred from all claim, demand or interest in and to the property, and for such other and further relief as might be proper. The plaintiffs replied to this answer, denying generally all the allegations therein contained, and also set forth some new matter. At the January term, 1889, the case was tried before the court and a jury, and the jury in answer to the following interrogatories made the following special findings, to wit:

"Ques. 1. What were the respective ages of the plaintiffs in 1870? Ans. Fidelia C. Everett was 25 years old, Ernest Barlow was 23 years old, Huldah A. Frazier was 19 years old, Mattie A. Allen was 17 years old, Flo Ellen Viers was 14 years old, Eldora A. Thompson was 11 years old, Frank F. Barlow was 9 years old.

"Q. 2. Describe the house erected on the premises in controversy in the year 1870, giving its dimensions and inside height in the clear from the floor, stating the number of rooms it contained, how deep it was set in the ground, what kind of floor it had, what material the walls were made of, and what kind of a roof it had. A. Log house, 18 x 22 feet; inside height, 8 feet; one room; two feet in ground; dirt floor; logs in walls; poles and dirt roof.

"Q. 3. Where and how were the materials for the walls of the house in controversy, erected in 1870, obtained? A. Poles and logs obtained from government land on Solomon river; windows and material for doors purchased.

"Q. 4. When was the first floor put in the house erected on the Barlow farm in 1870, and of what material was it made? And where and how was the material obtained? A. Was put in about one year after house was built; was made of cottonwood, the logs of which was taken to saw-mill at Beloit by David Williams.

"Q. 5. Who performed the labor required in erecting the

house built on the Barlow farm in 1870? A. Elizabeth Barlow's sons, principally; F. P. Barlow helped to roll up logs.

"Q. 6. Was a well dug on the Barlow farm in 1870; and if so, who dug it; how deep was it; and if walled, with what material was it walled, and when and how was the material obtained? A. Yes; well was dug about 46 feet deep; David Williams and Pythagoras Galbraith did the labor; walled with stone procured from government land.

"Q. 7. Were any improvements made on the house originally erected on the Barlow place in 1875 or 1876? And if so, what improvements were made? A. Addition 16x22 was built, frame house raised to $1\frac{1}{2}$ story; two pine floors and shingle roof put on, and stone wall two feet high put in as foundation.

"Q. 8. If you find that anything was added to the walls of the house on the Barlow farm in 1875 or 1876, of what material was the addition made, and where and how was the said material procured? A. Stone quarried from government land by David Williams.

"Q. 9. If you find that any floors were put in the house on the Barlow farm in 1875 or 1876, state how many such floors there were, and of what material they were made? A. Two pine floors.

"Q. 10. If you find that any roof was put on the house on the Barlow farm in 1875 or 1876, state what material said roof was made of? A. Cottonwood shingles.

"Q. 11. Was any prairie ground broken for cultivation on the Barlow farm between April, 1870, and March 13, 1877? If you should find that there was, state when it was done, who did it, and how much was done. A. There were 60 to 70 acres broken, in different years between 1870 and the spring of 1877; done principally by David Williams; Barlow did a little.

"Q. 12. Was any building intended as a granary erected on the Barlow farm between the years 1870 and 1877? If you find that there was, state its dimensions, whether divided into rooms; what material was used in its construction; where and how the material was obtained; what kind of a roof was put on it; who performed the labor of constructing it; and any other matter of description of the building you may find. A. Granary built, one part stone and one part cottonwood lumber; lumber part, 10 x 16 feet, and stone, 12 x 16; pine shingle roof; stone from government land and lumber from

logs from government land; labor of constructing and getting material done entirely by David Williams.

"Q. 13. Was any building intended as a stable erected on the Barlow farm between the years 1870 and 1877? If you find that there was, state its dimensions; what material it was made of; how it was covered; where and how the material was obtained and who performed the labor of constructing it; and when it was built. A. Yes, in 1872 or 1873; built of logs; poles and dirt roof; from government land; labor of procuring material and erecting stable performed principally by David Williams; F. P. Barlow did some of the work of erecting; 16x20 or 16x24 feet.

"Q. 14. If you find there was a corral constructed on the Barlow farm between April, 1870, and 1877, state when it was made; where it was located; the material used in it; when and how the material was obtained; and who performed the labor of constructing it. A. There were two corrals, one about house and well, and one for cattle, built of logs and poles, taken from the farm.

"Q. 15. Was the improved land on the Barlow farm cultivated during any of the time between April, 1870, and March 13, 1877? If so, who performed the labor of cultivating it? What kind of crops were raised, and on what years were crops raised? A. Yes; cultivated every year. Had some crops, principally wheat and corn, every year; labor performed principally by Mrs. Barlow's sons; Barlow occasionally did a little work in the field.

"Q. 16. Was the house erected on the Barlow farm in 1870 used as a place of residence by any persons between the time of its erection and March 13, 1877? If so, by whom was it used? A. Yes; by Mr. and Mrs. Barlow and Mrs. Barlow's sons.

"Q. 17. Who managed and directed, if anyone, the labor performed on the Barlow farm between April, 1870, and March 13, 1877? A. It was usually managed and directed by F. P. Barlow.

"Q. 18. Was any stock kept on the Barlow farm between April, 1870, and March 13, 1877? If so, what different kinds of stock; during what time was each kind so kept; and where was the feed raised by which said stock was kept? A. Yes; horses, all the time; hogs, from 1872 or 1873; cattle, from 1873. Feed was raised on farm, except that cattle were herded on this and other lands.

"Q. 19. What improvements were made on the Barlow farm after March 13, 1877, and before the death of F. P. Barlow, and who performed the labor of making said improvements? A. About 1,000 small forest trees one to two years old, set out; ½ mile hedge plants, set out; 27 currants, 75 or 80 raspberries, 15 grapes, 12 gooseberries, some cherry trees and peach trees; house was sided up on outside with pine siding, and window and door casings put in.

"Q. 20. If you find that any forest trees were planted on the Barlow farm between March 13, 1877, and the death of F. P. Barlow, state where said trees were procured. A. Procured from Solomon river.

"Q. 21. If you find that any hedge was planted on the farm in controversy between March 13, 1877, and the death of F. P. Barlow, state where the hedge plants so planted were raised. A. Were raised on the farm.

"Q. 22. If you find that Frederick P. Barlow, at any time or times after he homesteaded the land in controversy, and before March 13, 1877, promised the title to said land to Elizabeth A. Barlow, state the words with which he made such promise or promises. After giving said words, state the reply to them (if any) made by Elizabeth A. Barlow. A. After F. P. Barlow returned from Junction City, he told Mrs. Barlow he had homesteaded the land in question. He said they would build a house on the land, move onto it, improve it, and make a home of it. She said she was willing to go on the land and improve it and work it. She said she would furnish the money and labor to improve the land, provided she could have the deed to it. He said she should have the deed of it as soon as he could get it from the government. He said he wanted her to furnish him a home on the farm as long as he lived, and she said she would do it.

"Q. 23. If you find that Frederick P. Barlow, at any time or times after the 13th day of March, 1877, promised the title to the land in controversy to Elizabeth A. Barlow, state the words which he used in making such promise or promises. After giving said words, state the reply to them (if any) made by Elizabeth A. Barlow. A. When F. P. Barlow returned home with the receiver's receipt, and on or about the 14th day of March, 1877, he said to the defendant Elizabeth, in the presence and hearing of her sons: "Mother, you are monarch of all you survey. I have proved up upon the farm without difficulty, and it is yours now. You may go on and take charge

of, manage it and improve it just as you please, and as soon as I can get a patent from the government I will deed it to you [referring to the land in controversy] ; your money bought it, and you and your sons improved it, and I mean that you shall have it. I want you to furnish me a home and a living on the land while I live." In response to this, Mrs. Barlow said he should have a living, of course, while he lived; she thought she ought to have the land; it was hers; he agreed to give it to her before she came; that she was to have the land they got in this country provided they came here; that she was willing to do that.

"Q. 24. What physical ailment other than with his eyes did F. P. Barlow have after he came to Kansas, and before his last sickness? A. None shown by the evidence.

"Q. 25. Did F. P. Barlow's eyes grow worse or better as he continued to reside in Kansas ? A. Generally grew worse, but sometimes worse than at others.

"Q. 26. At what period of his residence in Kansas did F. P. Barlow (if at all) have to be led about by reason of his blindness; and how much of the time during the said period did he have to be so led ? A. At different times, about 1871.

"Q. 27. Did F. P. Barlow perform any of the labor of improving the land in controversy ? A. Yes, he did some labor ; in field and other heavy work he did very little; but in light matters, taking care of things generally, he did a good deal.

"Q. 28. Did Frederick P. Barlow, at any time after April, 1870, execute and deliver to Elizabeth A. Barlow an instrument in writing purporting to convey any personal property to her? If so, state if said instrument was acknowledged before an officer, and what officer. Also state what consideration (if any) was mentioned as coming from Elizabeth A. Barlow, and what personal property said instrument purported to convey to Elizabeth A. Barlow. A. He did make and deliver to her an instrument in writing, of which the following is a copy, viz. :

"'STATE OF KANSAS, MITCHELL COUNTY, SS.

"'KNOW ALL MEN BY THESE PRESENTS, That I, F. P. Barlow, of Beloit township, Mitchell county, Kansas, for the sum of $547, to me in hand paid by Elizabeth Barlow, of the same place, the receipt whereof is hereby acknowledged, have bargained and sold, and by these presents do grant and convey unto the said Elizabeth Barlow, her heirs and assigns, the following-described property, to wit: 1 white cow and calf, 1 roan cow, 1 white and red cow and calf, 1 red and white cow and calf, 1 red heifer and calf, 1 red cow, 1 white and red cow, 2 hogs, 1 yoke of oxen, and 1 bay mare; to have and to hold the same, unto the said Elizabeth Barlow, her heirs and assigns forever. And I, F. P. Barlow, do

hereby covenant and agree that I will forever defend the aforesaid prop-erty to and for the said Elizabeth Barlow, her heirs and assigns, against the lawful claim or claims of all persons whomsoever.

F. P. BARLOW.

"'Personally came before me, Joel Miley, justice of the peace in and for Beloit township, Mitchell county, Kansas, F. P. Barlow, well known to me, and acknowledged the execution of the within instrument to be his voluntary act and deed. Given under my hand, this 23d day of May, 1872.        JOEL MILEY, *Justice of the Peace.*

"'Executed in the presence of D. C. Kepler.'

" It does not appear from the evidence just when it was de-livered, but it was in her possession in 1885 or 1886.

"Q. 29. When did Frederick P. Barlow leave the plain-tiffs, and what provision (if any) did he make for the mainte-nance of such of the plaintiffs as were minors at any time during their minority? A. He left them in 1864, and never made any provision for their maintenance afterward.

"Q. 30. Who, if any one, has had the possession and use of the land in controversy since the death of Frederick P. Barlow? A. Elizabeth A. Barlow.

"Q. 31. What was the value of the improvements made on the house on the land in controversy after March 13, 1877, and before Barlow's death? A. $75.

"Q. 31½. What was the value of the forest trees and hedge planted on the land in controversy after March 13, 1877, after being so planted? A. From $60 to $65.

"Q. 32. For what materials used in the construction or improvements on the land in controversy did Elizabeth A. Barlow furnish money? A. She paid out money for all the materials that were bought.

"Q. 33. Before making a homestead entry upon the lands in controversy, was it agreed between Frederick P. Barlow and the defendant Elizabeth A. Barlow that the said Freder-ick should, with moneys to be furnished by said defendant, make a homestead entry upon said lands; that said lands should be improved and cultivated by means and labor to be furnished and employed by said defendant; that said Freder-ick P. Barlow should have a home upon said lands with said defendant; and that after a patent for said lands was issued to the said Frederick P. Barlow, that he, the said ·Frederick P. Barlow, should deed and convey the same to the said de-fendant Elizabeth Barlow? A. There was no agreement as to this particular land or to any homestead, but it was agreed that they should take land or buy land in Kansas, and she should have the title to it.

"Q. 34. Did the said defendant Elizabeth Barlow furnish to said Frederick P. Barlow the moneys with which he made entry upon the land in controversy, and with which he went to and from the land office? A. Yes.

"Q. 35. Did the said Frederick P. Barlow make a homestead entry upon the land in controversy, to wit, the northwest quarter of section 6, in township 7, of range 7 west, in Mitchell county, Kansas; if so, about what date did he make such entry? A. Yes; about April, 1870.

"Q. 36. Did the defendant Elizabeth Barlow furnish money and means with which to procure, and with which was procured and made improvements upon the land, and by means of which she furnished a home to said Frederick P. Barlow; and did she invest her money in improvements and in stock, tools, agricultural implements and other personal property which was kept on the land and used in its improvement, and for the support and benefit of said parties? [Plaintiffs except to submission of this question.] A. Yes.

"Q. 37. State the physical condition of Frederick P. Barlow in the years 1870, 1871, and 1872; and state particularly the condition of his eye-sight during that period. A. His eyes were sore all the time. Sometimes worse than others; part of the time he was so nearly blind as to require being led about.

"Q. 38. After the receiver's final receipt was issued, and on or about the 14th day of March, 1877, did the defendant Elizabeth Barlow take charge of the lands in controversy; and if she did, did she continue to have charge of the same up to the death of Frederick P. Barlow? A. She took charge of the improvements, setting out hedge and forest and fruit trees, and siding up the house. Barlow was sick during all or nearly all the time these improvements were being made, and confined to his bed about 10 days before he died.

"Q. 39. In what manner, if at all, did the said Frederick P. Barlow deliver possession of the lands in controversy to said defendant Elizabeth Barlow, on or about the 14th day of March, 1877? A. In addition to the conversation before found, he gave her the receiver's receipt, and told her to take it and take care of it.

"Q. 40. State whether Egbert Williams worked upon the land, and state also whether he brought his wages home, and whether the same were used for the benefit of the family? A. He worked on the land some, and worked out for farmers

in the neighborhood some, and brought some of his earnings home and gave them to his mother.

"Q. 41. State whether Charlie Williams and Arthur Williams worked upon the land? A. They worked on the land and herded cattle.

"Q. 42. When Frederick P. Barlow came to Kansas, did he ·have any money or any means of his own? A. He had little if any in Kansas.· If he had anywhere else, it is not shown.

"Q. 43. State what property and money the defendant Elizabeth Barlow had at the time she and Frederick P. Barlow moved to Kansas. A. $600 cash; $310 in notes, afterward paid; 5 horses; 1 wagon, and 2 sets of double harness.

"Q. 44. State what moneys she received from time to time after they removed to Kansas, aside from that which was earned by the joint efforts of herself or family·? A. $310 from notes, and $14 each month as pension to herself and children up to November 19, 1872, and $12 as pension from thence until the death of F. P. Barlow.

"Q. 45. Before the year 1885, did the defendant Elizabeth Barlow at any time know, or was she advised, that she had the right to compel the making of a deed to the lands in controversy to herself? A. No.

"Q. 46. Before the year 1885, did either of the plaintiffs ever make any claim to any part of or interest in the lands in controversy? A. No.

"Q. 47. Did Elizabeth A. Barlow in fact receive from F. P. Barlow any property under and by virtue of the bill of sale in evidence other than property which she had owned before the making of such bill of sale? A. She did not receive any such property from him as is described in the bill of sale on the farm in question, and as to whether she received from him at all there is no evidence unless it be the bill of sale itself."

The court also made the following findings and delivered the following opinion, to wit:

"FINDINGS AND OPINION OF THE COURT.

"Under the findings of the jury in this case, and the admission of fact, it is clear that the plaintiffs are the heirs at law of the deceased, Frederick P. Barlow, and are entitled to a partition of the estate claimed, unless the defendant Elizabeth A. Barlow has proven such a contract between herself and Frederick P. Barlow in his life-time to convey the land to

her, and such a part performance of the contract on her part as would take the contract, which is alleged to be oral, out of the statute of frauds, and would entitle her to a decree of this court for a specific performance of such contract on the part of herself and Frederick P. Barlow. So far as the first contract shown in evidence, made in Iowa before the parties came to this state, is concerned, it is too indefinite to admit of a decree of specific performance, and of course no specific performance of that contract is claimed in this case. The contract found by the jury as having taken place after the land in question was homesteaded by Frederick P. Barlow it is claimed is void, as being in violation of the statute of the United States relating to the transfer of homesteads before the issuing of patent thereon.

"That statute was evidently enacted for the purpose of securing to the homesteader and his family a home. So far as it relates to the individual interest, and so far as public interests are concerned to get the public domain into the possession and ownership of citizens, who should own and cultivate the land upon which they reside, and while any agreement or contract to convey the homestead to any third party before the issuance of a patent is prohibited for the purpose of preventing speculation in the public domain, I see no reason for prohibiting a contract which could only result in benefit to the same parties which the law contemplates should be benefited by the homestead entry—that is, the homesteader and his family. This contract, it appears by the findings, was ratified or renewed after the issuing of the receiver's receipt for the land, and after Frederick P. Barlow had proved up on his homestead, but perfected his title thereto as far as any act on his part could perfect it. It appears from the findings of the jury that all the cash expenditures for improvements of all kinds made upon the land, and for the support of the family during the making such improvements, were borne by the defendant Elizabeth A. Barlow, except such as may reasonably be inferred were paid from the products of the farm and the stock thereon. The findings and evidence do not show that at any time during the time the deceased, Frederick P. Barlow, and the defendant Elizabeth A. Barlow resided upon the land did Frederick P. Barlow remove from the land and deliver to the defendant the exclusive possession of the land. It does appear, however, that he delivered the charge and control of the place over to her, after the issuance of the receiver's re-

ceipt, as fully and as completely as would be consistent with
the terms of the contract and the relation between the parties.
If an open, notorious and exclusive possession of the real
property in question is essential to the decree of specific per-
formance, the decree in this case ought to be refused.    It is
claimed on the part of, the plaintiffs that the decree of specific
performance in this case would be inequitable as to them; that
their right to a share of the property of their father is para-
mount to the equities, if any, shown by the defendant Eliz-
abeth A. Barlow under her contract, and the court would
readily adopt this view of the case, if the subject-matter of the
action were land which had been acquired by Frederick P.
Barlow independently of the defendant; but the consideration
paid by Frederick P. Barlow for the land in question and the
manner of acquiring it seems to me a matter which the court
should take into consideration in determining this question,
and it appears to me more than probable under the evidence
and findings in the case that, but for the contract and under-
standing which have been alleged and found between Freder-
ick P. Barlow and the defendant Elizabeth A. Barlow with
reference to this land, and the performance of the same on her
part, that the deceased, Frederick P. Barlow, would never have
had any estate in the land which the plaintiffs could have
claimed.    It is true that the contract is more favorable to the
defendant Elizabeth A. Barlow, probably, than for the de-
ceased, Frederick P. Barlow, and was at the time it was made,
but this is no objection to the validity of the contract, and
seems to have been voluntary on his part, and with full under-
standing of the same in accordance with his intentions.    That
she performed all the conditions of the contract on her part to
his satisfaction during his life-time, is not questioned by the
evidence or findings; indeed, it appears the contract was fully
performed on her part.

    "While the court is in a great deal of doubt as to the ques-
tion of possession, and the character of possession, requisite
under the decisions of our courts, and while it is true that
many of the acts which it is claimed were done in the execu-
tion of the contract on the part of the defendant Elizabeth A.
Barlow might possibly have been done solely by reason of
her relation to Frederick P. Barlow, and were such as only
might have emanated from love and affection which should
be presumed to exist between the parties in such a relation,
still, if the evidence and findings make it clear that the par-

ties did in fact contract, and with reference to what should be done by the defendant and the deceased, Barlow, and that their contract, which was one they had a right to make, included certain things which might reasonably have been expected by Frederick P. Barlow without contract, I think that such acts should be construed with reference to the contract which is found by the jury from the evidence to have been made, and should not be disregarded because possibly they might be referred to some other obligation or relation.

"So far as the consideration of improvements is concerned, they are not found to be very large, but it seems to me that this matters little when we consider that at the time of the making of the first contract, after the homestead entry was made, the subject-matter of the contract was probably of little or no cash value, and their contract together to proceed to live upon, improve and make a home upon the land was in the nature of the contract of copartnership, by which the defendant Elizabeth A. Barlow undertook to put in the cash necessary to maintain the family and make the improvements, and to furnish labor to make the improvements, and Frederick P. Barlow, for the use and benefit of himself and family, put in his homestead right, with the understanding that the defendant Elizabeth should have legal title to the land as soon as it could be secured. Under these circumstances, it seems to me this is a small objection to the enforcement of a contract, that the consideration paid was a small consideration, if it is equitable. It was a matter that extended through years of time, and I think that the things done by the defendant in execution of the contract are not all of a character that could be computed in dollars and cents as to their value, although most of the matters that went to make up such consideration might possibly have resulted from the relation of husband and wife. If the husband sees fit to pay his wife for such services, I don't know of any law to prevent him, or any equitable consideration that would prevent him from so doing, especially if he does so with full understanding, and no one is injured thereby. After such a contract is fully executed on one side and only death prevents its execution on the other, if it is equitable, as it appears to have been in this case, I think the court should decree its specific performance on the part of the heirs of the decedent who was prevented by death from doing what he fully intended to do.

"The decree will be in favor of the defendant Elizabeth A.

Barlow, for a specific performance of the contract, in accordance with the prayer of her answer."

The plaintiffs excepted to each and every one of the findings of the court. The court also found generally in favor of the defendant *Mrs. Barlow*, and against the plaintiffs, and rendered judgment accordingly; and the plaintiffs, as plaintiffs in error, have brought the case to this court for review, making *Mrs. Barlow* the defendant in error.

*Horace Cooper*, for plaintiffs in error.

*A. H. Ellis*, for defendant in error.

The opinion of the court was delivered by

VALENTINE, J.: In 1868, the widow Elizabeth A. Williams, and the widower Frederick P. Barlow, were married in Iowa, each having children by a former marriage, Elizabeth having four sons—David, Egbert, Charles, and Arthur. She at the time had considerable property, and with her children was drawing a pension of $16 per month. He had no property of any consequence. In 1869, he became nearly blind, and he continued so during the remainder of his life. They then agreed to come to Kansas and procure land, and that whatever property they might obtain should belong to her. In the early spring of 1870 they removed from Iowa to Kansas, and settled in Mitchell county, upon 160 acres of government land (the land now in controversy); and in April of that year a homestead entry thereof was made in the name of the husband, she furnishing all the money to pay all the costs and expenses. At the time of their removal she had $600 in cash, $310 in good promissory notes which were afterward paid, five horses, one wagon, and two sets of double harness; and she and the children were then drawing a pension of $14 per month. He had no property. Afterward improvements were made upon the land, and these were all made by her and her sons, they having come from Iowa to Kansas with Barlow and wife. His children remained in Iowa, and have never resided in Kansas, and are now the

plaintiffs in this action. On March 13, 1877, final proof was made regarding this homestead entry, and a proper receipt or certificate was given. The proof was also made and the receipt or certificate issued in the name of Barlow, Mrs. Barlow furnishing the money to pay all the costs and expenses. On March 14, 1877, Barlow delivered to her the certificate and told her again that the land was hers, and that he would execute a deed to her for it after the patent should be issued, and that they would build a house thereon and make other improvements thereon; that he wanted her to furnish him a home on the land as long as he lived, and she said she would do it, and that she would furnish the money and labor to make the improvements. She continued to make improvements on the land up to the time of Barlow's death, and afterward. On April 23, 1877, Barlow died intestate, and without having executed to Mrs. Barlow any deed for the land. She and her children were then drawing a pension of $12 per month. She continued to live upon the land and to make improvements thereon; and on September 1, 1885, more than eight years after Barlow's death, his children and heirs brought this action for partition, claiming that they in the aggregate were entitled to one-half of the land. Mrs. Barlow has continuously resided upon the land ever since about April, 1870. She furnished all the money to procure the land and to make all the improvements thereon, and all this with the agreement and understanding between herself and her husband, before they left Iowa and afterward up to the time of his death, that the land should be hers; and the only question now presented is, whether upon all the facts of the case the land is hers or not.

We think this question must be answered in the affirmative. (Act relating to Trusts and Powers, § 8; Gen. Stat. of 1889, ¶ 7166; *Newkirk v. Marshall*, 35 Kas. 77; *Franklin v. Colley*, 10 id. 260; *Edwards v. Fry*, 9 id. 417; *Twiss v. George*, 33 Mich. 253; *Littlefield v. Littlefield*, 51 Wis. 23; *Johnson v. Hubbell*, 8 N. J. Eq. 332; *Davison v. Davison*, 10 id. 246; *Rhodes v. Rhodes*, 3 Sandf. Ch. 279.) Ever since the early

44—47 KAS.

spring of 1870, Mrs. Barlow has been in the actual possession of the property, with and in pursuance of the agreement and understanding between herself and husband that the property should be hers. All the money expended for the procurement of the property, and for putting improvements thereon, was hers; and although Mr. Barlow was the nominal head of the family, yet, because of his infirmities, she was the real and actual head thereof. The agreement between herself and husband was not to destroy their homestead interest in the property, or the homestead interest of either, or to deprive either of the occupancy thereof, but it was simply to transfer the title to the homestead from the nominal head to the real head of the family, and the husband was to remain on the homestead and occupy it as his home as long as he should live; and even with the title in his wife, she could not, under our homestead exemption laws, deprive him of his right to occupy it as his homestead as long as he should live.

In our opinion, all the equities in the case are in favor of Mrs. Barlow, and as the court below so held and gave her the property, its judgment will be affirmed.

All the Justices concurring.